IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DON McADAMS,
Fed. Reg. #37768-177
    Plaintiff,

vs.                                            Case No.: 5:15cv312/WTH/EMT

A. PELT, Optometrist, et al.,
    Defendants.
_____/

**REPORT AND RECOMMENDATION**

This cause is before the court upon Defendant Nicole English's Motion to Dismiss Plaintiff's Amended Civil Rights Complaint for failure to state a claim upon which relief may be granted (ECF No. 60). Plaintiff has filed a response in opposition (ECF No. 73).

Dismissals for failure to state a claim are governed by Federal Rule of Civil Procedure 12(b)(6). Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997). The allegations of the complaint are taken as true and are construed in the light most favorable to Plaintiff. Davis v. Monroe County Bd. of Educ., 120 F.3d 1390, 1393 (11th Cir. 1997). To survive the motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009)

(quotation and citation omitted). A claim is plausible on its face where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). Plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quotation and citation omitted).

The determination of whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679 (citation omitted). The pleader is not entitled to relief "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.* (citing Fed. R. Civ. P. 8(a)(2)). The court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 678 (quotation and citation omitted). And "bare assertions" that "amount to nothing more than a formulaic recitation of the elements" of a claim "are conclusory and not entitled to be assumed true." *Id.* at 681 (quotation and citation omitted). Stated succinctly:

> . . . a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions,

> are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Id.* at 679. Finally, consistent with the foregoing precepts, in civil rights cases more than "mere conclusory notice pleading" is required, and a complaint is subject to dismissal "as insufficient where the allegations it contains are vague and conclusory." Gonzalez v. Reno, 325 F.3d 1228, 1235 (11th Cir. 2003) (quotation and citation omitted).

English also asserts that she is entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). The Supreme Court has explained that "the driving force" behind the qualified immunity doctrine is to ensure that "'insubstantial claims' against government officials be resolved prior to discovery and on summary judgment if possible." Anderson v. Creighton, 483 U.S. 635, 640 n.2, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). Because

this defense should be applied at the earliest possible stage of litigation, it is proper for a district court to rule on a claim of qualified immunity asserted in a motion to dismiss, Gonzalez, 325 F.3d at 1233, although the defense is more "typically addressed at the summary judgment stage of a case." St. George v. Pinellas Cnty., 285 F.3d 1334, 1337 (11th Cir. 2002). To survive a motion to dismiss on qualified immunity grounds, a plaintiff must satisfy the two-pronged qualified-immunity standard: (1) the facts alleged in his complaint constitute a violation of his constitutional rights, and (2) the constitutional rights were "clearly established" when the defendant committed the complained-of act. Pearson, 555 U.S. at 232. A qualified-immunity inquiry can begin with either prong; neither is antecedent to the other. *Id.* at 236.[1]

Plaintiff raises his claims under Title 28 U.S.C. § 1331 and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971). Plaintiff alleges that he received inadequate attention to his eyes, particularly his right eye, following an April 28, 2012, incident in which

---

[1] To receive qualified immunity, a public official must first establish that she was acting within the scope of her discretionary authority when the allegedly wrongful acts occurred. Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). A government official acts within her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority. Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1303 (11th Cir. 2006). Here, there is no dispute that Defendant English was acting within her discretionary authority.

Case No.: 5:15cv312/WTH/EMT

he was injured while playing softball, evidently at the Federal Correctional Institution at Marianna, Florida ("FCIM"), where he was incarcerated prior to his transfer to the Federal Correctional Institution at Seagoville, Texas.  Plaintiff claims the failure to properly treat his eye during the several months he was at FCIM resulted in him "going blind" (ECF No. 14 at 5).  He therefore claims deliberate indifference to his serious medical needs in violation of the Eighth Amendment, for which he seeks compensatory and punitive damages.

Prior to the softball injury, Plaintiff had been diagnosed with myopia or nearsightedness.  Following the accident, on May 1, 2012, Plaintiff was seen by Defendant Eden Abad, who refers to herself as a "mid-level practitioner" (ECF No. 52 at 1).  She noted Plaintiff to have "ecchymosis in his right eye lid" and in his "right infraorbital area." (ECF No. 14 at 5).  Instead of performing an "actual eye test," which according to Plaintiff would have prevented further damage, she evidently made a request for an appointment with an optometrist, but it was never followed up on (*id.*).  After numerous complaints and trips to sick call regarding loss of sight, blurred vision, dizziness and headaches, Plaintiff again was seen on September 19, 2012, by Abad who did not treat his eye issues directly but ordered testing for high

blood pressure, the results of which were negative. Abad's diagnosis of Plaintiff remained only myopia.

On November 3, 2012, Plaintiff underwent a vision test with a Ms. Pierce who found him to have 20/100 vision in his right eye and 20/60 vision in his left. When Plaintiff was next seen by Abad on November 5, 2012, Abad started him on propranolol for high blood pressure despite the fact that, according to Plaintiff, he did not have high blood pressure (ECF No. 14 at 7). Plaintiff stopped taking the propranolol because the medication allegedly made him sick. After Plaintiff returned to sick call complaining about his vision, he was again seen by Abad on January 24, 2013. He complained of blurred vision, dizziness, loss of sight, and headaches, which Abad again attributed to high blood pressure and therefore conducted no examination of his eyes (ECF No. 14 at 6). Plaintiff refused his blood pressure medication because it made him ill and might have caused him harm.[2] On March 1, 2013, Abad evidently started Plaintiff on another medication for high blood pressure, antenolol, which Plaintiff also claims made him ill (ECF No. 14 at 7).

After a referral from another Defendant in this action, Dr. A. Pelt, on March 28, 2013, Plaintiff evidently was examined and diagnosed with "optic atrophy" in his

---

[2] Plaintiff indicates that Abad refused to accept the medical determination of a Dr. Peddada, but he fails to describe neither Dr. Peddada nor his or her findings (ECF No. 14 at 7).

right eye, which Plaintiff describes as having caused him permanent and irreversible damage (ECF No. 14 at 8). Plaintiff also relates that he was diagnosed with hypertensive retinopathy" in both eyes (ECF No. 14 at 6–7). When Plaintiff again saw Abad on May 22, 2013, Abad maintained that Plaintiff's eye issues were due to high blood pressure and treated only that (*id.*).

During the above time frame, while Plaintiff was seeking what he considered to be proper treatment for his medical problems, he utilized the prison grievance procedure at FCIM. This eventuated Plaintiff submitting a grievance to Defendant English, the warden at FCIM. After initially filing a grievance with Defendant on December 15, 2012, Plaintiff states he was convinced to "drop it" by an "investigating officer" who told him he would be seen by an ophthalmologist on the first week of January of 2013 (ECF No. 14 at ¶ 20). After the appointment did not materialize, Plaintiff again filed a grievance with Defendant on January 23, 2013; this time a different investigator "coerced" him (under circumstances that Plaintiff does not explain) into dismissing the grievance (*id.* at ¶ 21). On February 22, 2013, Plaintiff again filed a grievance with Defendant, and this time Defendant responded to the grievance, denying it (*id.* at ¶ 22). Plaintiff asserts that the explanation provided in Defendant's denial was an exact copy of the earlier grievance response provided by

the FCIM medical department: that Plaintiff's problem was high blood pressure, which was within normal limits (*id.*).

Plaintiff further indicates that he contacted United States Senator Tammy Baldwin regarding his medical issues, who evidently responded by contacting Defendant English regarding the matter (ECF No. 73 at ¶ 9).[3] Defendant responded with a letter to Senator Baldwin, explaining Plaintiff's various medical conditions—erroneously, according to Plaintiff (ECF No. 14 at ¶ 24). On April 4, 2015, Defendant again wrote a letter to Senator Baldwin, explaining that Plaintiff was diagnosed with optic atrophy NOS, OD, and optic nerve atrophy (*id.* at ¶ 25).[4]

As Defendant asserts, supervisory officials are not liable in a Bivens civil rights claim[5] for the unconstitutional acts of their subordinates on the basis of *respondeat*

---

[3] Tammy Baldwin is a United States Senator from the state of Wisconsin. *See* https://www.baldwin.senate.gov (accessed on May 31, 2018). Plaintiff provides no explanation as to why he contacted Senator Baldwin in particular. While Defendant mentions two letters, she does not mention that Senator Baldwin was the recipient of those letters.

[4] The date of this letter may not be accurate due to a what appears to be a typographical error by Plaintiff. Plaintiff does not explain whether this second letter was in response to a second inquiry from Senator Baldwin.

[5] As has long been held, claims against federal officials under Bivens are analogous to those brought against state officials under 42 U.S.C. § 1983, and therefore courts generally apply § 1983 law to Bivens cases. *See* Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 81–82, 122 S. Ct. 515, 527, 151 L. Ed. 2d 456 (2001); Ashcroft v. Iqbal, 556 U.S. 662, 675–76, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009); Abella v. Rubino, 63 F.3d 1063, 1065 (11th Cir. 1995). Thus, many of the cases that follow, while derived from § 1983 law, are equally applicable to the instant Bivens action.

*superior* or vicarious liability. *See* Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (internal quotation marks and citations omitted). Supervisory liability may occur, however, either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. *Id.* (citation omitted). This connection may be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so, or when a supervisor's custom or policy 'result[s] in deliberate indifference to constitutional rights' or when facts support 'an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.'" *Id.* (internal quotation marks and citations omitted); Wayne v. Jarvis, 197 F.3d 1098, 1105 (11th Cir. 1999). Isolated incidents are generally insufficient to establish a supervisor's liability; indeed, the deprivations must be "'obvious, flagrant, rampant and of continued duration . . . .'" Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1308 (11th Cir. 2006) (quoting Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999)).

Importantly here, filing a grievance with a supervisory person does not alone make the supervisor liable for the allegedly violative conduct brought to light by the

grievance, even if the grievance is denied.  Wayne, 197 F.3d at 1106; Weaver v. Toombs, 756 F. Supp. 335, 337 (W.D. Mich. 1989), *aff'd*, 915 F.2d 1574 (6th Cir. 1990); *see also* Bellamy v. Bradley, 729 F.2d 416, 421 (6th Cir. 1984).  Knowledge imputed to the supervisor "must be so pervasive that the refusal to prevent harm rises to the level of a custom or policy of depriving inmates of their constitutional rights." Tittle v. Jefferson County Comm'n, 10 F.3d 1535, 1542 (11th Cir. 1994).

Supervisors are generally entitled to rely on their subordinates to respond appropriately to situations absent clear or widespread evidence to the contrary.  "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous."  Cottone, 326 F.3d at 1360 (internal quotation marks and citation omitted).  In particular, a supervisory defendant is entitled to rely on the judgments of medical personnel.  *See* Williams v. Limestone County, Ala., 198 F. App'x 893, 897 (11th Cir. 2006).  A claim of medical indifference cannot generally be made against non-medical personnel unless they personally involved themselves with a denial of treatment or deliberately interfered with the medical treatment.  Miltier v. Beorn, 896 F.2d 848, 854 (4th Cir. 1990). Unless there is direct evidence to show that a warden or other supervisory official should not have relied on such medical expertise, "it would be an unprecedented

extension of the theory of supervisory liability to charge . . . wardens, not only with ensuring that [the inmate] received prompt and unfettered medical care, but also with ensuring that their subordinates employed proper medical procedures—procedures learned during several years of medical school, internships, and residencies." *Id*.; *see also* Keith v. DeKalb Cnty., Ga., 749 F.3d 1034, 1050 (11th Cir. 2014) (the law does not require that non-medical officials ignore the determination and recommendation of medical staff); Dolihite v. Maughon ex rel. Videon, 74 F.3d 1027, 1054–55 (11th Cir. 1996); Acosta v. Watts, 281 F. App'x 906, 908 (11th Cir. 2008) (finding no liability against prison administrator where administrator's decision-making was grounded in decision made by medical personnel).

In the instant case, Plaintiff does not allege sufficient facts to show that liability against Defendant English would amount to anything more than *respondeat superior*. The simple fact that Defendant denied Plaintiff's grievances is clearly insufficient. Although Plaintiff obviously takes exception to the medical treatment he was provided, he alleges no widespread or pervasive wrongdoing by medical staff that might have dissuaded Defendant from ordinarily relying on their medical expertise to deal with Plaintiff's ailments. In conclusory fashion, Plaintiff suggests that Defendant

interfered with the grievance process, but this at best was a temporary setback as Plaintiff ultimately received Defendant's answer to his grievance.[6]

Plaintiff also indicates that Defendant did not follow her own rules regarding the grievance process and may have violated her administratively prescribed duties as leader. The failure to follow regulations in and of itself does not amount to a constitutional violation. *See* Hernandez v. Estelle, 788 F.2d 1154, 1158 (5th Cir. 1986) (citing Vodicka v. Phelps, 624 F.2d 569, 575 (5th Cir. 1980)) . At most, the violation of a prison administrative rule confers a procedural or due process right only, but not any substantive right. Robinson v. Conner, No. 2:12-CV-397-TMH, 2012 WL 2358955, at *4 (M.D. Ala. May 31, 2012), *report and recommendation adopted*, No. 2:12CV397-TMH, 2012 WL 2359879 (M.D. Ala. June 20, 2012) (citing Buckley v. Barlow, 997 F.2d 495 (8th Cir. 1993)); *see also* Clark v. Noe, No. 216CV00920MHHTMP, 2017 WL 4707897, at *5 (N.D. Ala. Oct. 20, 2017)

---

[6] It bears noting here that no constitutional right is violated simply because of the failure to respond to a prison grievance. Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994); Ouzts v. Cummins, 825 F. 2d 1276, 1277 (8th Cir. 1987); Azeez v. DeRobertis, 568 F. Supp. 8 (N.D. Ill. 1982). A liberty interest does not arise merely from the existence of regulations creating an administrative remedy procedure. Adams v. Rice, 40 F.3d at 75; Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991) (per curiam); *see also* Sandin v. Conner, 515 U.S. 472, 486, 115 S. Ct. 2293, 2301, 132 L. Ed. 2d 418 (1995) (holding that due process protections are generally not available relative to prison grievances because the their deprivation does not impose an "atypical and significant hardship" on the inmate); First Assembly of God v. Collier County, Fla., 20 F.3d 419 (11th Cir. 1994) (the violation of a state statute which mandates only procedure does not ordinarily rise to the level of a due process violation).

("Violations of prison policy may constitute negligence, but negligence alone does not suffice to establish deliberate indifference for purposes of a § 1983 claim.") (citing Davis v. Scherer, 468 U.S. 183, 194–95 (1984)).

Last, Plaintiff relates that he communicated with Senator Baldwin who then communicated with Defendant English about Plaintiff's medical condition. The extent of Plaintiff's allegations are simply that Senator Baldwin notified Defendant English of what she already knew, that Plaintiff was complaining about his medical problems. There is no indication that Senator Baldwin knew anything about Plaintiff's situation beyond what Plaintiff evidently told her. Although as a public figure Senator Baldwin might be of elevated stature, there is nothing to indicate that she had any medical expertise to impart, much less any information, lay or otherwise, that Plaintiff wasn't able to impart to Defendant herself. In sum, her participation in the matter does not change the fact that Defendant was entitled to rely upon her own medical staff to provide appropriate treatment.

Accordingly, the court finds that, because Plaintiff's claims against Defendant English are based solely on a *respondeat superior* argument, he fails to state a proper claim against her. Having found such, the court additionally finds that Defendant English did not violate Plaintiff's clearly established rights and would therefore be

entitled to qualified immunity. In so finding, the court emphasizes that, even if Senator Baldwin's alleged involvement with this case could be considered as sufficient notice of institutional wrongdoing to establish supervisory liability, the court can find no legal precedent to clearly establish that intervention by a sitting senator or other such political or governmental figure, by her very title, can override a prison warden's right to reasonably rely on her medical staff.

A constitutional violation may be clearly established either by similar, prior precedent, or in rare cases of "obvious clarity." Coffin v. Brandau, 642 F.3d 999, 1013–14 (11th Cir. 2011). With either method, the touchstone is whether the right would be apparent to a reasonable officer. *Id.* Under the first approach as is relevant here, the court looks only to binding precedent—holdings of cases drawn from the United States Supreme Court, the Eleventh Circuit, or the highest court of the state where the events took place. *See id.* at 1013. "Exact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law." *Id.* The qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)). An official's awareness of an abstract right "does not equate to knowledge

that his conduct" may infringe that right.  *Id.* at 1015 (quoting <u>Smith v. Mattox</u>, 127 F.3d 1416, 1419 (11th Cir. 1997)).  Further, "officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases."  *Id.*

As there is no available legal precedent to clearly establish that a senator's intervention in a case such as this, especially one where that involvement amounted only to an exchange of letters that imparted no particularized information relevant to the case, even if that involvement could show that Defendant English violated Plaintiff's rights, that right was not clearly evident at the time that Defendant acted.

For the aforementioned reasons, it is respectfully **RECOMMENDED**:

1. That Defendant Nicole English's Motion to Dismiss (ECF No. 60) be **GRANTED**.

2. That Defendant Nicole English hereby be **DISMISSED** from this action.

At Pensacola, Florida, this 4<u>th</u> day of June 2018.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**