IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

DON McADAMS,
Fed. Reg No. 37768-177,
        Plaintiff,

vs.                                          Case No.: 5:15cv312/MW/EMT

A. PELT, Optometrist, et al.,
        Defendants.
_____/

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Don McAdams, an inmate of the Federal Bureau of Prisons ("BOP"), proceeds pro se and in forma pauperis in this civil rights action brought under Title 28 U.S.C. § 1331 and <u>Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics</u>, 403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971). Presently before the court are Motions for Summary Judgment separately filed by Defendants Dr. A. Pelt (ECF No. 76; *see also* ECF No. 81 (exhibits thereto)) and Eden Abad (ECF No. 86), the two remaining Defendants in this action. Plaintiff has filed responses to the motions for summary judgment along with evidentiary materials (ECF Nos. 90, 91). Defendant Pelt also filed a reply which includes an "Objection that a Fact is not Supported by Admissible Evidence" (ECF No. 94).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B)(C); Fed. R. Civ. P. 72(b).   After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that both Defendants' motions for summary judgment should be granted.

I.     INTRODUCTION AND BACKGROUND

Plaintiff provides that he is now incarcerated at the Jess Dunn Correctional Center in Oklahoma, but at all times relevant to his complaint he was incarcerated at the Federal Correctional Institution at Marianna, Florida ("FCIM").   Plaintiff alleges that he received inadequate medical attention for his eyes, particularly his right eye, following an April 28, 2012, incident in which he was injured while playing softball at FCIM.   Plaintiff claims the failure to properly treat his eye during the months following the incident while he was at FCIM resulted in his right eye "going blind" (ECF No. 14 at 5).   Plaintiff thereby claims a violation of his rights under the Eighth Amendment in that Defendants responded with deliberate indifference to his serious needs for medical treatment.   As relief, Plaintiff seeks compensatory and punitive damages (*id.* at 11).

## II.    PRELIMINARY ISSUE

As an initial matter, Defendant Pelt asserts that, as a matter of law, he is not amenable to suit under <u>Bivens</u> because he is a private actor.  Defendant states that, while he provides services as an optometrist at FCIM, he is not an employee of the prison but rather a private contractor.[1]

Plaintiff contends that, by contracting with FCIM, Defendant Pelt has essentially become a government actor.  Plaintiff bases his reasoning on the Eleventh Circuit opinion in <u>Ancata v. Prison Health Servs., Inc.</u>, which held that, "[w]here a function which is traditionally the exclusive prerogative of the state . . . is performed by a private entity, state action is present."  769 F.2d 700, 703 (11th Cir. 1985).  However, <u>Ancata</u> concerned civil actions brought against state officials under Section 1983, not against federal officials under <u>Bivens</u>.  While it is true that <u>Bivens</u> actions run parallel

---

[1] Defendant explains that he is the President of Pelt Eye Clinic, which was awarded a contract with the BOP to provide optometry services for inmates at FCIM.  As per the terms of the contract and other documentation, Pelt was identified as an independent contractor, a "contract physician," and a "Consultant[] – Non-BOP – Contract Physician."  Pelt Eye Clinic's contract with FCIM lasted from April 2010 until 2014, when NaphCare contracted with FCIM to provide medical services, during which time Pelt Eye Clinic became a subcontractor with NaphCare and essentially continued its practice of providing optometry services at FCIM.  Pelt Eye Clinic continued in this capacity until August 7, 2017.  Thus, during the entire time frame of Plaintiff's complaint, Defendant Pelt worked at FCIM in his capacity as a private contractor or subcontractor (*see* ECF No. 76 at 2–4 and citations to the record therein).

While Plaintiff challenges Defendant's conclusion that he is therefore not considered to be governmental employee acting under color of federal law, he does not challenge any of the factual assertions above.

to Section 1983 actions as far as legal standards and burdens of proof, the field of what qualifies as a recognized cause of action under Bivens is quite limited.  *See* Ziglar v. Abbasi, 137 S. Ct. 1843, 1857, 198 L. Ed. 2d 290 (2017).  In large part, this owes to the fact that Section 1983 actions are statutorily created under 42 U.S.C. § 1983, whereas federal actions under Bivens are essentially judicially implied causes of action.  *Id.* at 1855.

In fact, the Supreme Court has made it clear that expanding the Bivens remedy into new contexts is now a "disfavored" judicial activity.  *Id.* at 1857; *see also* Ashcroft v. Iqbal, 556 U.S. 662, 675, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). However, one area where a Bivens action was created was for Eighth Amendment claims of deliberate indifference to the medical needs of prisoners, as held in Carlson v. Green, 446 U.S. 14, 100 S. Ct. 1468, 64 L. Ed. 2d 15 (1980).  Carlson concerned an inmate in a federal institution operated by the BOP, and the Defendants were comprised of employees of the federal government who worked at the institution. Recognizing that tort claims could not ordinarily be brought against federal employees because they are shielded from tort liability under the Federal Tort Claims Act, the court thereby founded a Bivens action based on the need for an alternative remedy to deter officers from violating constitutional rights.  *Id.* at 18–20.

Subsequently, the Supreme Court decided <u>Correctional Services Corp. v. Malesko</u>, 534 U.S. 61, 122 S. Ct. 515, 151 L. Ed. 2d 456 (2001), which also involved a prisoner's Eighth Amendment medical claims, but ones which were raised against a private company that had contracted with the BOP to operate one of its prisons.  In holding that the private company was not susceptible to suit under <u>Bivens</u>, the Court reasoned in part that, because the prisoner was able to bring a state tort action for damages, unlike the prisoner in <u>Carlson</u>, he did not "lack effective remedies."  *Id.* at 72–74.[2]

The Supreme Court then decided <u>Minneci v. Pollard</u>, 565 U.S. 118, 132 S. Ct. 617, 181 L. Ed. 2d 606 (2012), which held that no <u>Bivens</u> cause of action should be implied where an employee of a private company operating a federal prison was sued under the Eighth Amendment on a claim of medical indifference.  Here, the Court explained that the prisoner could bring tort claims for negligence or malpractice under state law against the private employees, and thus the prisoner's opportunity to pursue a claim for damages was roughly the same.  *Id.* at 129–30.  As well, the Court found that the ability to pursue the state law remedy provided the same sort of incentive for the defendants to comply with constitutional mandates.  *Id.* at 130.  While the Court

---

[2] The Court also cited the fact that the underlying purpose of <u>Bivens</u> was to deter individual officers from unconstitutional behavior, not the private contractor company that was the lone defendant in the case before it.  *Id.* at 71.

recognized that the state law action and a <u>Bivens</u> action are not necessarily the same, it provided the following:

> We note . . . that state tort law may sometimes prove less generous than would a <u>Bivens</u> action, say, by capping damages, or by forbidding recovery for emotional suffering unconnected with physical harm, or by imposing procedural obstacles, say, initially requiring the use of expert administrative panels in medical malpractice cases. But we cannot find in this fact sufficient basis to determine state law inadequate.

> State-law remedies and a potential <u>Bivens</u> remedy need not be perfectly congruent. Indeed, federal law as well as state law contains limitations. Prisoners bringing federal lawsuits, for example, ordinarily may not seek damages for mental or emotional injury unconnected with physical injury. *See* 42 U.S.C. § 1997e(e). And <u>Bivens</u> actions, even if more generous to plaintiffs in some respects, may be less generous in others. For example, to show an Eighth Amendment violation a prisoner must typically show that a defendant acted, not just negligently, but with "deliberate indifference." And a <u>Bivens</u> plaintiff, unlike a state tort law plaintiff, normally could not apply principles of *respondeat superior* and thereby obtain recovery from a defendant's potentially deep-pocketed employer.

> Rather, in principle, the question is whether, in general, state tort law remedies provide roughly similar incentives for potential defendants to comply with the Eighth Amendment while also providing roughly similar compensation to victims of violations.

*Id.* at 129–30.

The instant case presents perhaps one further permutation in the Eighth Amendment prisoner context; here, Defendant asserts that he is an employee of a private contractor providing optometry services to the BOP. This situation is distinct

from <u>Malesko</u> and <u>Minneci</u> where the private contractor assumed the operation of the entire prison, but this is a distinction without a difference.  The pivotal factor is that Defendant is a private individual working for a private company, albeit not a company which has contracted to operate an entire prison facility but only to handle one aspect of the prison's operation.  Defendant is still privately employed, and as such he is amenable to suit under state law.  Hence, Plaintiff would have an alternative remedy to <u>Bivens</u> that would provide essentially the same deterrent effect against Defendant.[3] As emphasized in <u>Ziglar</u>, the existence of alternative remedies itself can preclude a court from authorizing a <u>Bivens</u> cause of action.  This case closely aligns with <u>Minneci</u>, and therefore this court should not find that this <u>Bivens</u> action may proceed against Defendant Pelt.  Nonetheless, even if Defendant Pelt were found subject to <u>Bivens</u>, the undersigned concludes that Plaintiff's claims against him should be dismissed on the merits, and for that reason the court will address Plaintiff's claims as against both Defendants.

---

[3] Since at least 1985, the Florida Legislature set out procedures for medical negligence lawsuits in the State of Florida, including pre-suit investigation and notice procedures.  *See* Florida Statutes, Chapter 766; <u>Dockswell v. Bethesda Mem'l Hosp., Inc.</u>, 210 So. 3d 1201, 1206 (Fla. 2017); <u>Kukral v. Mekras</u>, 679 So. 2d 278, 280 (Fla. 1996).

III.    SUMMARY JUDGMENT STANDARD

    A.    <u>Legal Standards of Review</u>

In order to prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his or her case or present affirmative evidence that the nonmoving party will be unable to prove his or her case at trial. *See* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Speculation or conjecture from a party cannot create a genuine issue

of material fact. *See* Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1181 (11th Cir. 2005).

"A mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, Fla., 358 F.3d 859, 860 (11th Cir. 2004); *see also* Celotex Corp., 477 U.S. at 324. The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See* Celotex Corp., *supra*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to him or her. *See* Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999). Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove. *See* Celotex Corp., 477 U.S. at 317. A motion for summary judgment should

be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322.

B.    Material Facts

As this case comes before the court on Defendants' motions for summary judgment, the court is required to view the facts in the light most favorable to Plaintiff, the nonmoving party  See Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993).  The court does so here, referring to Defendants' statements of facts, and taking those facts from the parties' pleadings and summary judgment materials of record. Fed. R. Civ. P. 56(c); N.D. Fla. Loc. R. 56.1.  Nevertheless, the court observes that what are stated as "facts" herein for purposes of summary judgment review may not be the actual facts.  See Montoute v. Carr, 114 F.3d 181, 182 (11th Cir. 1997).

With regard to the factual positions asserted by the parties, the court must apply the standard set forth in Rule 56(c) of the Federal Rules of Civil Procedure, which provides in relevant part:

> **(1) Supporting Factual Positions.**  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

. . . .

**(4) Affidavits or Declarations.** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. 56(c) (2010). Facts asserted in hearsay statements which are not subject to a hearsay exception, and thus would not be admissible in evidence, are insufficient to show that a fact is genuinely disputed.

If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court will consider the fact undisputed for purposes of the motion for summary judgment, or grant summary judgment if the moving party's motion and supporting materials—including the facts considered undisputed—show that the moving party is entitled to it. *See* Fed. R. Civ. P. 56(e)(2, 3) (2010).

IV.    FACTS

On February 8, 2011, Plaintiff was diagnosed with myopia, or near-sightedness (ECF Nos. 14 at 5; 86-1 at 159). Plaintiff's right eye was measured at 20/200 vision and his left eye at 20/100 (ECF No. 86-1 at 159). On April 28, 2012, Plaintiff was hit in the face with a batted ball while playing a game of softball at FCIM (ECF Nos. 14 at 5; 86-1 at 1). Plaintiff was seen that day in the medical unit by a nurse who noted swelling in Plaintiff's eyes and an abrasion below his right eye (ECF No. 86-1 at 1). Plaintiff appeared alert and oriented and not in distress (*id.*).

On May 1, 2012, Plaintiff was seen for follow up by Defendant Eden Abad, who was employed as a mid-level practitioner ("MLP") at FCIM. Plaintiff did not report being in pain and appeared alert and oriented (ECF No. 86-1 at 5–6). Plaintiff's blood pressure was measured at 133/68 (*id.*). MLP Abad conducted an eye examination, which by routine she described as including the following procedures:

> I.    With the room darkened and while he is in the sitting position, I use the ophthalmoscope to test for the pupillary reflex, if the pupils are reactive to light or not. I check the eye for the size and shape of the pupil, whether dilated or constricted; round or not.
>
> II.    I examine each eye individually—for the conjunctiva, cornea, and sclera. I check for discoloration, bleeding; foreign bodies, hemorrhages, redness, and discharge.
>
> III.    With one eye covered at one time with my left hand I ask the patient to follow the light from the ophthalmoscope to test for extra ocular movements if intact or not.

IV.    Examine the eyelids and eyebrows for swelling, bruises, and bleeding or open wounds.  I check for any abnormalities around each eye, such as swelling, open wounds, bruises, and bleeding.

V.    I ask the patient to stand up 20 feet away from the Snellen eye chart and request for him to read which letters he can see clearly for each eye, with his hand covering the opposite eye.  This test is for the measurement of visual acuity.

When an ophthalmoscope was unavailable I substituted a simple penlight.

ECF No. 86-2 at 2.  Upon examination of Plaintiff, his eyes were noted to be normal in appearance except for a bruise on his "right upper eyelid and right infraorbital area, nontender, no swelling" as a result of the softball injury (*id.* at 6).  Abad's eye examination also revealed pupils equal, round, reactive to light and accommodation (PERRLA).[4]  Abad also stated the following:

42 years old white male with blurred vision.  He was seen in optometry clinic on 02-08-2011, diagnosed with myopia and astigmatism, received eye glasses on 04-11-2011 but cannot see with the eye glasses.  Right eye = 20/60, left eye = 20/60.  He had a recent injury to the right eye on 04-28-2012 with a softball when he tried to catch the ball, the ball slipped to his gloved hands and hit the right 4th finger.  Please, schedule for complete vision and eye health exam.  Thank you.

86-1 at 7.

---

[4]  As Abad indicates in her affidavit, the PERRLA notation is an acronym that is apparently commonly used to denote the characteristics identified above (*see* ECF No. 86-2 at 3).

On May 2, 2012, Plaintiff was taken for a "Facial Bones Waters Head" x-ray examination (*id.* at 11).  The findings were "Negative.  No displaced facial bone fracture is demonstrated.  If clinical concern persists, consider CT." (*id.*).

Plaintiff was seen by an optometrist, Defendant Dr. Pelt, on June 19, 2012, and was diagnosed with myopia, astigmatism, and presbyopia (*id.* at 18–20).  As Defendant Pelt stated in his Answers to Plaintiff's Interrogatories, Plaintiff's medical records from that visit indicated that had "corrected vision of 20/20 in both eyes with no ocular health issues" (ECF No. 81-7 at 3).  During the visit, Plaintiff complained that he had been dispensed the wrong glasses, and new glasses were ordered (ECF Nos. 81-7 at 3; 86-1 at 7, 20).

Dr. Pelt saw Plaintiff again on October 23, 2012, and again ordered more glasses for him because the ones he had did not appear to be correct (ECF Nos. 81-7 at 3; 86-1 at 7).  As Pelt explained, Plaintiff's vision problems were correctable:

> On [October 23, 2012], [Plaintiff's] best corrected vision was RE 20/20, LE 20/20, and both 20/15.  His confrontation visual fields were full. His intraocular pressure was normal.  His anterior exam was normal. His retinal exam was normal including optic nerve evaluation with distinct margins and cup rims.  New glasses were ordered.
>
> After reviewing the visits from February 8, 2011, June 19, 2012, and October 23, 2012, Plaintiff's only complaint had been poor distance vision and receiving incorrect glasses.  Comparison among the visits shows they were virtually the same.  Following his evaluation, he was diagnosed as myopic with astigmatism, correctable to better than 20/20 in

both eyes.  There was no ocular pathology in either eye.  If Plaintiff did complain of blurred vision and rapid loss of eye sight, he was evaluated, his retinal exam was completed, and he was diagnosed with myopia with astigmatism, correctable to better than 20/20 in both eyes.

ECF No. 81-7 at 3.

On November 3, 2012, Plaintiff was seen by a nurse in the medical unit, complaining of blurred vision and headaches, which were the only symptoms that had not subsided after a recent illness that had also caused fever, diarrhea, and vomiting (ECF No. 86-1 at 59).  The nurse noted that during his October 23 visit he was seen for the blurred vision and headaches, and he was evaluated with 20/100 vision in his right eye and 20/60 vision in his left eye (*id.*).  A visual acuity examination provided during the November 3 visit produced the same results (*id.*).  The nurse also noted that Plaintiff was photophobic.

Two days later, on November 5, 2012, Plaintiff was seen by MLP Abad as follow up.  Abad identified Plaintiff's chief complaint as a headache, and provided the following description of Plaintiff's subjective symptoms:

> 42 years old white male was seen on 11-03-2012 for blurred vision and headache.  NO blindness.  He has history of migraine headache at 8-9 years old and he took aspirin for it which helped.  As he grew older, he was given injections (benadryl) for migraine headache.  He has right eye pain, blurred vision and photophobia.  Right eye = 20/100, left eye = 20/60.  He was seen in Optometry clinic on 10-23-2012 with diagnosis of myopia and astigmatism and eyeglasses were ordered.

ECF No. 86-1 at 62.

MLP Abad examined Plaintiff's eyes and, other than noting his photophobia, found his eyes to be normal, with extraocular movements intact, and normal appearing conjunctiva, sclera, cornea, and lens (*id.* at 63). Plaintiff's blood pressure was 117/81 (*id.* at 62). Abad diagnosed Plaintiff with migraine headaches, for which she prescribed propranolol (*id.* at 63–64). Abad ordered daily blood pressure testing over a course of five days (*id.* at 64). Plaintiff's blood pressure was tested on November 7, 8, 13, and 14, 2012, with results of 118/79, 127/85, 127/95, and 113/72, respectively (*id.* at 70).

On November 13, 2012, Plaintiff was seen by Dr. Martinez for follow up. While Dr. Martinez noted Plaintiff's history of blurred vision and the headaches, and because his migraine headaches were seen as "Not improved/same," he provided an additional prescription for naproxen to help with the headaches (*id.* at 67–68). Martinez also requested a general radiology examination of the skull because of Plaintiff's history of headaches and blurred vision (*id.* at 68).

On November 26, 2012, and again on January 16, 2013, Plaintiff reported to sick call with complaints of dizziness, the first time after running on the track and the second time while working at his UNICOR job. He was seen both times by the nurse on duty, to whom he reported nearly passing out (*id.* at 72, 76). During the second

visit, Plaintiff denied having a headache but "continues to c/o 'loss of sight.' He has come to sick call about this problem and states he has not been properly evaluated." (*id.* at 76). The nurse consulted with an unidentified MLP who recommended Cromolyn nasal spray, which the nurse ordered, and phenergan, which the nurse administered during the visit (*id.* at 76–77).

On January 24, 2013, Plaintiff was seen in medical by MLP Abad, having made a sick call request on January 17 and stating "right eye" as his reason for the request (*id.* at 84–85). Plaintiff represented that he had been complaining about blurred vision in his right eye since November 30, 2012 (*id.* at 85). Abad noted that he had not received his new eyeglasses yet (*id.*). Plaintiff stated that he did not have migraines and stopped taking the propranolol for them because the medication made him dizzy (*id.*). Abad therefore discontinued the propranolol, and Plaintiff signed a form indicating his refusal to take the medication (*id.* at 86–87, 88). Plaintiff's eye appeared normal under examination (*id.* at 86). Abad noted that Plaintiff was scheduled for an appointment with Dr. Pelt on January 30, 2013 (*id.* at 85).

On January 25, 2013, Plaintiff saw Dr. Hector Lopez in the chronic care clinic complaining of blurred vision which had been "a gradual chronic problem" over the past couple of months and getting worse, especially in the lower half of his right eye (*id.* at 89). Dr. Lopez's examination of Plaintiff's eyes yielded normal results, and

a visual acuity test revealed Plaintiff's right eye at 20/100 and his left eye at 20/50 (*id.* at 90). As Plaintiff had no other symptoms, Dr. Lopez appeared to elect to wait for the results of Dr. Pelt's upcoming evaluation before any further intervention (*id.* at 91).

On January 30, 2013, Plaintiff saw Dr. Pelt. As Dr. Pelt relates, he noted that Plaintiff had complained of decreased vision in his right eye since November 3, 2012 (ECF No. 81-7 at 3). Pelt further noted that Plaintiff "saw superiorly, his eye ran water, and 'no injury.' A diagnosis of retinal swelling into the macula was made. The record indicates an immediate referral to a retinal specialist was recommended." (*id.* at 3–4; *see also* ECF No. 86-1 at 94).

Upon review of Dr. Pelt's request, Dr. Lopez arranged for an ophthalmological consultation (ECF No. 86-1 at 93), and on February 7, 2013, Plaintiff was seen by Ophthalmologist Ram Peddada, M.D. (*id.* at 155). According to Dr. Peddada's notes, Plaintiff reported having a sudden loss of vision that started approximately three months prior while Plaintiff was running, causing blurred vision and headaches (*id.*).[5]

---

[5] Plaintiff's description of this sudden loss of vision would seem to recall the November 26, 2012, running incident described above wherein Plaintiff reported to sick call after running on the track.

Plaintiff also complained that he was experiencing flashes of light in his right eye, associated with daily activities and chores, which also began about three months prior (*id.*).   Dr. Peddada diagnosed Plaintiff with Hypertensive Retinopathy, with the following comment:

> FA procedure was performed and tolerated well after risks and benefits were explained.  FA showed no active ischemia or leakage.  Exam and fundus photos confirm exudates and vascular sheathing.   Strongly recommend primary care physician to monitor blood pressure and loss of vision OD which may be due to posterior AION (anterior ischemic optic neuropathy).  Although AION is less likely with no APD[6] or disc changes.  Monitor blood pressure closely.

*Id.* at 157.  Dr. Peddada also diagnosed Plaintiff with vitreous floaters and vitreous detachment (*id.*).  Thus, Dr. Peddada's recommendation for followup at FCIM was to closely monitor Plaintiff's vision and monitor his blood pressure, which Dr. Peddada tested at 141/77 during Plaintiff's visit (*id.* at 156).  Upon return to FCIM that day, Plaintiff's blood pressure was measured at 148/82 (*id.* at 96).  MLP Abad requested that Plaintiff be scheduled for a follow-up ophthalmological appointment two months later to check for apparent pupillary defect (*id.* at 98).

On February 27, 2013, Plaintiff was seen by MLP Abad, who provided the following notations:

---

[6] "APD" is elsewhere defined in medical record notes as "apparent pupillary defect" (*see* ECF No. 86-1 at 98).

His BP today is 138/81 and I offered him to take lisinopril 5 mg. orally daily but he refused to take it and he refused to sign the refusal form. RN Futch signed the refusal form as witness. He was given a pass for BP check on Mondays, Wednesdays and Fridays at 3:00 P.M. for two months and he took it. He said that he cannot come at 12:30 P.M. because he was working in recreation. No sports for two months. No eye pain.

*Id.* at 101.

On March 1, 2013, Plaintiff was seen by MLP Abad, who noted: "Today he agreed to take BP medication due to elevated BP of 145/80. No dizziness, headache and chest pain." (*id.* at 108). Plaintiff was started on atenolol (*id.* at 109). Plaintiff was then seen by Abad on March 12, 2013, for follow up on his blood pressure readings, which she noted were 145/80, 139/82, 178/86, 160/80, 118/72, 135/81 , and 140/86 as taken during various points between March 1 and 12 (*id.* at 112). Abad noted that, although Plaintiff was given instruction to take atenolol tablets daily, Plaintiff may have not complied—as Plaintiff related to her that he would not come to the "pill line" to take his medication (*id.*). Abad considered Plaintiff's hypertension to not be controlled, "maybe from non-compliant," and advised that Plaintiff continue to come to the pill line for his atenolol every day and continue with blood pressure checks three time per week (*id.*).

On March 28, 2013, Plaintiff was seen by Ophthalmologist John G. Fortin, M.D., for a Retina Evaluation Follow Up Exam (*id.* at 151). Plaintiff's stated complaint

was flashes of light in his right eye (*id.*). Dr. Fortin's impression/plan was as follows: "Optic atrophy Nos OD – Optic Nerve Atrophy – ? post-traumatic – Discussed diagnosis in detail with patient. No treatment required at this time. No change to current treatment. Keep f/u care with Dr. Peddada" (*id.* at 153). Dr. Fortin separately indicated that the follow up with Dr. Peddada should be in six months (*id.*).

Plaintiff was seen back at FCIM one day later on March 29, 2013, wherein he reported to MLP Albu-Gardner that he recently had decreased vision in his right eye, that Dr. Fortin told him that it was okay to run and that his "visual disturbance" was from "old injuries," and that his atenolol medication was unnecessary for protecting his eyes from further damage (*id.* at 118). Albu-Gardner's notes indicate that she switched Plaintiff's atenolol for lisinopril (*id.* at 119).

Plaintiff returned to MLP Abad on May 22, 2013. Plaintiff was reported to have refused to take his lisinopril and would not sign the refusal form (*id.* at 127–28). Plaintiff's blood pressure was taken at 140/78. As no treatment was required at this time by Dr. Fortin, Abad continued Plaintiff's normal regimen of blood pressure testing but discontinued his lisinopril because of Plaintiff's refusal (*id.* at 128–29). A six-month follow-up ophthalmology consultation was requested as well as an August 15, 2013, "chronic care visit" with an MLP (*id.* at 130). At a June 5, 2013, visit with

MLP Abad, Plaintiff's blood pressure was measured at 150/76, but he maintained in his refusal to take any medication for it (*id.* at 133).

On July 30, 2013, Plaintiff was seen by Ophthalmologist Dr. Seymour Rosen, M.D. (*id.* at 154). Dr. Rosen diagnosed Plaintiff with optic atrophy in his right eye secondary to trauma, and he scheduled a follow up visit for six months later (*id.*). The follow up request was made at the institution by Dr. Ortiz (*id.* at 139).

At an October 1, 2013, appointment, MLP Abad noted that Plaintiff's blood pressure was 123/72, which she defined as "controlled by diet and ezercises [sic]" (*id.* at 140). Abad conducted her normal eye examination, with normal results and no eye pain (*id.* at 140, 142).

Abad states that she retired from her job on October 31, 2013 (ECF No. 86-2 at 1). According to Dr. Pelt, Plaintiff was seen by him on April 22, 2014, during which visit "Plaintiff stated he was hit with a soft ball in April 2012 and now has a blind eye" (ECF No. 81-7 at 4).

## V.   STANDARDS OF DELIBERATE INDIFFERENCE[7]

---

[7] As has long been held, claims against federal officials under <u>Bivens</u> are analogous to those brought against state officials under 42 U.S.C. § 1983, and therefore courts generally apply § 1983 law to Bivens cases. *See* <u>Corr. Servs. Corp. v. Malesko</u>, 534 U.S. 61, 81–82, 122 S. Ct. 515, 527, 151 L. Ed. 2d 456 (2001); <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 675–76, 129 S. Ct. 1937, 1948, 173 L. Ed. 2d 868 (2009); <u>Abella v. Rubino</u>, 63 F.3d 1063, 1065 (11th Cir. 1995). Thus, many of the cases that follow, while derived from § 1983 law, are equally applicable to the instant <u>Bivens</u> action.

The government has a constitutional duty to provide at least minimally adequate medical care to its prisoners. Harris v. Thigpen, 941 F.2d 1495, 1504 (11th Cir. 1991). Nevertheless, not every prisoner claim of inadequate medical care states an Eighth Amendment violation. Estelle v. Gamble, 429 U.S. 97, 105, 97 S. Ct. 285, 291, 50 L. Ed.2 d 251 (1976). To prevail on a deprivation of medical care claim, a prisoner must prove an "objectively serious medical need" so grave that, "if left unattended, poses a substantial risk of serious harm." Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (internal quotation marks, alterations and citations omitted). "[A] serious medical need is . . . one . . . diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation marks omitted). The seriousness of the deprivation of medical care may be measured by the detrimental effect the deprivation brought upon the person. Hill v. DeKalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1188-89 (11th Cir. 1994).

Additionally, to establish the requisite intent, "a plaintiff must demonstrate that the public official acted with an attitude of 'deliberate indifference.'" Taylor, 221 F.3d at 1258 (quoting Estelle, 429 U.S. at 105). A claim of deliberate indifference requires proof greater than negligence or even gross negligence. Townsend v. Jefferson County, 601 F.3d 1152, 1158 (11th Cir. 2010). Deliberate indifference is not

established "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970, 1979, 128 L. Ed. 2d 56 (1994). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Farmer, 511 U.S. at 842, 114 S. Ct. at 1983. Disregard of the risk is also a question of fact that can be shown by standard methods. Id. at 846.

Medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference. Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986). Thus, a complete denial of readily available treatment for a serious medical condition, or treatment so slight that it amounts to not treatment at all, constitutes deliberate indifference. Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir. 1994). A delay in providing medical treatment can also constitute deliberate indifference. Estelle, 429 U.S. at 104–05; Adams v. Poag, 61 F.3d 1537, 1544 (11th Cir. 1995). However, the inmate must be able to "place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment . . . ." Townsend, 582 F.3d at 1259. "Cases stating a constitutional claim for immediate or emergency medical attention

have concerned medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." *See* <u>Youmans v. Gagnon</u>, 626 F.3d 557, 561 (11th Cir. 2010); *see also* <u>Farmer</u>, 511 U.S. at 834 (serious medical need is one that, if left unattended, "pos[es] a substantial risk of serious harm."). In delay of treatment cases, relevant factors include: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." <u>Goebert v. Lee Cty.</u>, 510 F.3d 1312, 1327 (11th Cir. 2007).

However, where the inmate has received medical treatment, and the dispute is over the adequacy of that treatment, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. <u>Harris v. Thigpen</u>, 941 F.2d at 1507 (quoting <u>Waldrop v. Evans</u>, 871 F.2d 1030, 1035 (11th Cir. 1989)). To do otherwise would be "to constitutionalize claims that sound in tort law." <u>Hamm v. DeKalb County</u>, 774 F.2d 1567, 1575 (11th Cir. 1985) (quotation omitted). Thus, a simple difference in medical opinion as to diagnosis or a course of treatment does not establish deliberate indifference. *See* <u>Adams</u>, 61 F. 3d at 1545 (the question of whether a plaintiff should have received different diagnostic tests or treatments is not an appropriate basis for grounding liability on a deliberate indifference claim); <u>Harris v. Thigpen</u>, 941 F.2d at 1505. "[W]hether governmental actors should have employed

additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." Adams, 61 F. 3d at 1545 (quoting Estelle, 429 U.S. at 107, 97 S.Ct. at 293); *see also* Hamm, 774 F.2d 1567, 1575 (11th Cir. 1985) (prisoner's desire for a different form of medical treatment does not constitute deliberate indifference). Additionally, a misdiagnosis of a condition is not an adequate basis for deliberate indifference unless the defendant knowingly created the misdiagnosis. *See* Campbell v. Sikes, 169 F.3d 1353, 1366–67 (11th Cir. 1999); Mitchell v. McKeithen, 672 F. App'x 900, 903 (11th Cir. 2016).

VI.    DISCUSSION

Plaintiff maintains that both Defendants ignored his complaints of vision loss and failed to treat his needs, especially during the time period from April to November of 2012 when, ostensibly, Plaintiff claims that the vision in his right eye became irretrievably lost. Plaintiff states that Defendant MLP Abad's treatment amounted to a "substantial departure from accepted medical professional judgements, practices or standards as to demonstrate that the person did not base her decision on any medical judgement at all" (ECF No. 14 at 5). Plaintiff states that, despite the fact that he complained to Defendant Dr. Pelt regarding his loss of vision, with his right eye at 20/100 and his left at 20/60, Pelt would not refer Plaintiff to an ophthalmologist until

January of 2013 when he noted mascular edema and then made the referral (*id.* at 8). Also, following his appointment(s) with one or more ophthalmologists, Plaintiff states that, despite the diagnosis of hypertensive retinopathy, MLP Abad informed him during his May 22, 2013, appointment with her that no treatment was required.[8]

The problem with all of Plaintiff's contentions is that, other than a couple of specifics which will be discussed shortly, they are nothing more than conclusory statements without evidentiary support. There is simply no support for his assertions that either Defendant ignored medical standards by taking the courses of action they took. The court takes as true Plaintiff's assertions that he reported having vision loss to both Defendants, but without more, it cannot be said that Defendants failed to respond appropriately to his problem, much less with deliberate indifference. Plaintiff contends that the vision in his right eye was 20/100 and 20/60 in his left, but this hardly establishes that any greater intervention was necessary. The facts show that Plaintiff had already been diagnosed with myopia astigmatism, and presbyopia, and during much of the time in the months following the softball incident, Plaintiff was in the

---

[8] Plaintiff's assertion here is confusing given the fact that a May 2013 appointment would suggest that the ophthalmologist Plaintiff had in mind was Dr. Fortin, whom he had visited on March 28, 2013. Additionally, Abad's statement that no treatment was required would reflect Dr. Fortin's medical recommendation. However, Plaintiff identifies hypertensive retinopathy as the diagnosis at issue, which would have derived from his earlier visit with Dr. Peddada on February 7, 2013, and which resulted in a recommendation for blood pressure treatment and monitoring, which Abad followed.

midst of ongoing difficulty getting him outfitted with the proper glasses to correct his vision.    That Defendants might have considered other reasons for Plaintiff's diminished vision would seem unsurprising given the circumstances.  Plaintiff also received attention to his softball injuries, including an x-ray examination to determine if there were any fractures, and those results were negative.

Plaintiff may have wanted more specialized treatment—especially when viewing events and outcomes in retrospect—but he cannot say he did not receive treatment from Defendants.  The court recognizes that Plaintiff's softball injury was essentially a traumatic incident, and that months later, Dr. Fortin diagnosed him with  optic atrophy and indicated that the atrophy might have been "post-traumatic."[9]  But while Plaintiff thereby asserts that his permanent loss in vision could have been prevented, he fails to show, or even say, how.  Dr. Fortin's diagnosis says nothing about the cause and effect between the trauma and the optic atrophy, nor does it say anything to the

---

[9]  In fact, the notation in Dr. Fortin's statement of diagnosis, "? post-traumatic," with its quizzical question mark, suggests that there is some question as to whether Plaintiff's condition was actually caused by trauma (ECF No. 86-1 at 153).  It may simply reflect that Plaintiff reported the softball incident to Dr. Fortin but that without further information Dr. Fortin could not fully conclude that trauma, or the softball trauma in particular, was the cause of the problem.  Additionally, Dr. Rosen later made a diagnosis of optic atrophy secondary to trauma, but, especially since his notes were in handwritten form, it is difficult even to discern whether this constituted a "fresh" diagnosis or whether it was merely a recordation of the diagnosis Dr. Fortin had already made (*id*. at 139).  In any event, there is no elaboration as to how the trauma might have affected Plaintiff's vision.

effect that any particular kind of medical intervention might have ameliorated his condition.

Plaintiff also asserts that neither Defendant dilated his eyes while examining him (ECF No. 14 at 5). Here, Plaintiff appears to state that through dilation, either Defendant would have the opportunity to see the trauma damage. Once again, however, there is no evidence to indicate what sort of damage they might have found and how this might have dictated a specific medical intervention or remedial measure, if any were in fact available to prevent further injury or loss of sight. What is evident from the record is that when Defendant Pelt's examination on January 30, 2013, revealed retinal swelling, an immediate referral to an ophthalmologist was made (ECF Nos. 81-7 at 3–4; 86-1 at 94).

Plaintiff faults Defendant Abad for treating him for high blood pressure instead of performing additional, unidentified tests. Abad's concerns appear justified, however, considering Plaintiff's high blood pressure measurements (*see* ECF No. 86-2 at 2), his history of hypertension, and, most pointedly, because Dr. Peddada, the first ophthalmologist to examine Plaintiff, determined that his blood pressure was linked to his loss of vision and ordered that his blood pressure be treated and monitored closely (ECF No. 86-1 at 156–57).

Finally, Plaintiff submits an excerpt from a medical publication titled the Merck Manual, written by ophthalmologist James Garrity, M.D., the excerpt pertaining to an eye disorder, papilledema. (ECF No. 91-1 at 2–19). Plaintiff contends that this article "describes the same symptoms and resulting damages that plaintiff sustained" and therefore required the same sort of examination of the eye as was detailed in the article (ECF No. 91 at 3). Plaintiff also cites similarities between Pelt's diagnosis of retinal swelling and the papilledema diagnosis, and thereby concludes that Pelt's subsequent recommendation that Plaintiff see a retinal specialist "ASAP" was not expedient enough (*id.*).

There are a handful of problems with the use of this article, however. First, Defendant Pelt asserts in his Objection (ECF No. 94) that this publication is inadmissible because it is unaccompanied by an expert's testimony as a basis for his or her opinion and is otherwise hearsay. *See* Fed. R. Evid. 803(18). Because the article might be reduced to usable form, such as when used for impeachment purposes or not used to prove the truth of the matter asserted, *see* Macuba v. Deboer, 193 F.3d 1316, 1323 (11th Cir. 1999), the court will for the purposes of this argument consider the article. Even if admissible, though, the fundamental problem is that the article relates to an eye disorder that is not even mentioned in the facts of this case. Although Plaintiff may try to draw factual similarities between the disorder in the article and his

own diagnoses, by doing so he is essentially testifying as an expert. Only an expert could draw comparisons between the eye disorders and extrapolate from them as Plaintiff has done, and one would think, the better avenue would be to simply extrapolate from articles dealing directly with Plaintiff's diagnosed disorders.

Furthermore, the article appears to be of questionable applicability because it is written by an ophthalmologist and is therefore ostensibly not written for optometrists or MLP's. In this light, the article may actually be beneficial to Defendants, to the extent it may be perceived to contain guidelines or procedures that only someone with an ophthalmological level of expertise should follow—and therefore represents a standard of care that Defendants could not be expected to meet. Accordingly, the court finds the article irrelevant to its summary judgment inquiry.

In sum, the court finds that both Defendants attempted to provide appropriate treatment for Plaintiff's vision problems. Plaintiff's claims against their treatment decisions are unfounded and conclusory. Where an inmate complains of delay in treatment, he must place verifying medical evidence into the record to establish the detrimental effect of delay, *see* <u>Townsend</u>, *supra*, but Plaintiff fails to do so.

Further, even if there were some validity to Plaintiff's arguments that other, more effective courses of treatment were available, Defendants' failure to implement them at most evinces negligence, which is not actionable under an Eighth Amendment

claim of deliberate indifference. *See* <u>Townsend</u>, *supra*. Plaintiff's contentions remain only a difference of opinion over the diagnosis of his eye disorder and any other matter of medical judgment pertaining thereto; matters of difference of opinion, especially when they are between the inmate and medical staff, do not amount to constitutional violations.[10] *See* <u>Adams</u>, <u>Campbell</u>, *supra*.

For the aforementioned reasons, it is respectfully **RECOMMENDED**:

1.     That the Motions for Summary Judgment filed by Defendants Dr. A. Pelt (ECF No. 76) and Eden Abad. (ECF No. 86) be **GRANTED**.

2.     That all other pending motions be **DENIED** as moot.

3.     That Judgment be entered accordingly and this case closed.

At Pensacola, Florida, this 3<u>rd</u> day of December 2018.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE**

**JUDGE**

---

[10] Though the court refrains from any more definitive statement than what is in this footnote, it bears noting that the diagnoses among the three ophthalmologists involved in this case appear different *from each other*. Based on the current record, it would seem awkward indeed to conclude that Defendants were deliberately indifferent because Plaintiff's medical need was so obvious that even a layperson would recognize it, when medical professionals better qualified than they are do not appear in agreement over the particulars of the case.

## <u>NOTICE TO THE PARTIES</u>

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.